UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JANE MIKE DOE, | ) | |
| | ) | |
| Plaintiff,[1] | ) | |
| | ) | |
| v. | ) | Civil Action No. 24-2412 (ABJ) |
| | ) | |
| DISTRICT OF COLUMBIA, | ) | |
| | ) | |
| Defendant. | ) | |

# MEMORANDUM OPINION

Before the Court is Defendant District of Columbia's Motion to Dismiss (ECF No. 15) under Federal Rules of Civil Procedure 8 and 12(b)(6) which, for the reasons discussed below, is **GRANTED**.[2]

## I. LEGAL STANDARD

A plaintiff need only provide a "short and plain statement of the claim showing that [she is] entitled to relief," FED. R. CIV. P. 8(a)(2), that "give[s] the defendant fair notice of what the claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (internal quotation marks,

---

[1] Chief Judge Boasberg issued an Order (ECF No. 8) on December 17, 2024, granting Doe's second motion (ECF No. 6) for leave to proceed under a pseudonym, and the undersigned **GRANTS** her third (ECF No. 11).

[2] The Court **DENIES** Doe's motions for CM/ECF password (ECF No. 38) and for hearing (ECF No. 60) as moot.

1

ellipses and additional citation omitted). A defendant may move to dismiss a complaint on the ground that it "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).

To withstand a motion to dismiss under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A facially plausible claim pleads facts that are not "'merely consistent with' a defendant's liability" but that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556); *see Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) ("Plausibility requires more than a sheer possibility that a defendant has acted unlawfully[.]").

The Court must consider the entire complaint, with all factual allegations accepted as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555. The Court cannot, however, "assume the truth of legal conclusions . . . [or] accept inferences that are unsupported by the facts set out in the complaint.'" *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)) (internal citations and quotation marks omitted); *see Iqbal*, 556 U.S. at 681 (stating that conclusory allegations are "not entitled to be assumed true").

In applying these standards to a *pro se* litigant's pleadings, the Court must consider the complaint "in light of all filings, including filings responsive to a motion to dismiss." *Brown v. Whole Foods Mkt. Grp., Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015) (per curiam) (citing *Richardson v. United States*, 193 F.3d 545, 548 (D.C. Cir. 1999)) (internal quotation marks omitted). Here, the

Court considers Doe's opposition to the District's motion to dismiss (ECF No. 21), as supplemented (ECF No. 22, "Supp. Mem."), and her surreply (ECF No. 42, "Surreply").[3]

## II. PLAINTIFF'S FACTUAL ALLEGATIONS

Jane Mike Doe ("Doe" or "plaintiff") is, as she describes herself, a single White woman, a United States citizen, and a native Washingtonian. *See* Compl. ¶¶ 1-2; Opp'n I at 98-99; Supp. Mem. ¶¶ 15-16. And she is homeless. Compl. ¶ 2. This civil action arises from the alleged failure of the District of Columbia ("District" or "defendant") to provide her shelter.

In June 2021, Doe "was told that the waiting list for an open bed at a [women]-only shelter in DC would be over 36 months." *Id*. ¶ 4 (internal quotation marks omitted); *see id*. ¶ 17. Since February 2024, Doe has been "outside homeless." *Id*. ¶ 7 (internal quotation marks omitted).

According to Doe, during hypothermia season, the District provides the homeless "unisex cots in a gymnasium."[4] Compl. ¶ 10; *see id*. ¶¶ 5, 11. At other times of the year, the District allegedly offers no shelter suitable for plaintiff, *see, e.g., id*. ¶¶ 9, 12, 17, and the "outside homeless are forced to stay outside with literally nowhere to go[.]" *Id*. ¶ 24 (internal quotation marks omitted); *see id*. ¶¶ 7, 27. For example, she alleges having been turned away from a shelter between April and July 2024. *See id*. ¶¶ 19, 24. By contrast, Doe alleges, the District provides "non-native Washingtonians, who are also known as 'illegal aliens with children,'" *id*. ¶ 10; *see*

---

[3] Doe's opposition exceeds 800 pages, and is so voluminous that it is docketed in four parts, which the Court designates Opp'n I (ECF No. 21), Opp'n II (ECF No. 21-1), Opp'n III (ECF No. 21-2), and Opp'n IV (ECF No. 21-3). It largely repeats the allegations of the complaint itself. The same can be said of plaintiff's supplemental memorandum and surreply, and the contents of plaintiff's "NOTICES" (ECF Nos. 24-31, 34-35, 39-41, 43-59, 62-71) have no bearing of substance on the legal arguments set forth in the District's motion.

[4] "Hypothermia season" presumably refers to "outdoor conditions whenever the actual or forecasted temperature, including the wind chill factor . . . falls below 32 degrees Fahrenheit[.]" D.C. Code § 4-751.01(35).

*id*. ¶¶ 11-12, 24, hotel rooms, *see, e.g., id*. ¶¶ 10, 14, offering private bedrooms with actual beds, private bathrooms, and doors that lock, *see id*. ¶¶ 10-11, even during non-hypothermia season, *see id*. ¶ 24; *see id*. ¶¶ 25-26.

Doe considers this practice a violation of the Equal Protection Clause. She alleges that the District affords "preferential treatment to illegal aliens with children on DC soil . . . to determent [sic] of USA citizen who safeguards [her] ovaries." *Id*. ¶ 15. Thus, "undocumented unwed mothers are favored by the defendant . . . in violation of the 14th Amendment's Equal Protection Clause[.]" *Id*. ¶ 20 (internal quotation marks omitted); *see id*. ¶¶ 13-15, 20. In addition, Doe alleges, the District "violate[s] federal immigration law" through its "'sanctuary city' policies" which "give[] un-equal treatment to illegal aliens with children." *Id*. ¶ 23.

Doe alleges that the District violates the Americans with Disabilities Act also, asserting that the District at no time provided shelter which accommodated her myriad disabilities. *See, e.g., id*. ¶¶ 2, 9, 12, 17. Doe claims to be "directionally challenged," *id*. ¶ 3, and due to what she calls her "directional disabilities," *id*. ¶ 9, she "can only live," *id*., in a shelter on Connecticut Avenue in Chevy Chase (Ward 3) or downtown on 14th Street (Ward 2), *see id*., "where [she] knows the terrain." *Id*. Allegedly "these are the only areas where [Doe allegedly does] not get lost[.]" Supp. Mem. ¶ 8.

In addition to having "severe Directional Dyslexia," Supp. Mem. ¶ 8, Doe alleges she is physically disabled, *see* Compl. ¶ 5, describing herself as "Visually Impaired and Neuromuscular, Gross Motor Skills challenged," Supp. Mem. ¶ 6, and a sleepwalker. *See id*. ¶ 7. Due to those conditions, Doe allegedly is a "fall risk," Supp. Mem. ¶ 6, who "cannot be on a top bunk" at a shelter, Opp'n I at 29, because she is "unable to safely mount and dismount a 'top bunk,'" Supp. Mem. ¶ 6, particularly if the shelter is "without high wattage lighting." *Id*. Doe alleges a sensitivity

4

to "anaphylaxis inducing chemicals" such as "cleaning chemical bleach," Compl. ¶ 9, and says that no District-run shelter is free of such chemicals. *See* Opp'n I at 6-7, 19-23. Nor is there a shelter where she would not be exposed to another person's "ADA service dog." Compl. ¶ 9.

Doe alleges she was not offered an "'Open Bed' with 'ADA Accommodations' during Hypothermia Season on the bases of [her] physical and pulmonary medical conditions." Supp. Mem. ¶ 4. By accommodations, Doe appears to mean a bottom bunk, *see id*. ¶¶ 6-7, in a shelter free from 'Anaphylactic inducing chemicals (i.e. bleach)," *id*. ¶ 5, located "within Ward 2, 14th Street Corridor or within Ward 3, Connecticut Avenue Chevy Chase DC." *Id*. ¶ 8; *see also* Opp'n II at 111-15; Opp'n III at 192-95, 197-202. Doe alleges having been told by an unidentified female District government employee "who works for shelter services," Opp'n I at 6 n.2, by telephone during hypothermia season that a city-run shelter was "not appropriate lodging for" her, *id*. at 6, if she could not "bunk [herself] into a top-cot," *id*. (internal quotation marks and footnotes omitted), and that no shelter "would be free of anaphylaxis (throat closure) bleach cleaning chemicals." *Id*. Thus, Doe alleges, she was left to find alternative lodging on her own. *See, e.g., id*. at 6-10, 25-31; Compl. ¶ 5.

Doe asks the Court "to resolve matters of the Equal Protection Clause of the 14th Amendment while the [District government] does nothing in light of the recent SCOTUS decision precluding 'outside' homeless here on DC soil." Compl. ¶ 36. She is not seeking monetary relief. *See* Opp'n IV at 35.

## III. DISCUSSION

### A. Shelter Placement Under District of Columbia Law

The District argues that Doe is not entitled to placement in a shelter except in extreme weather conditions, and plaintiff does not allege that she was denied a placement in such

circumstances. *See generally* Mem. of P. & A. in Support of Def. District of Columbia's Mot. to Dismiss (ECF No. 15-1, "Def.'s Mem.") at 5-7. It points to the Homeless Services Reform Act of 2005 ("HSRA") which "governs homeless shelter placement in the District." *Id*. at 5. Generally, the District is to offer through multiple agencies a range of services "designed to meet the specific, assessed needs of individuals and families who are homeless or at risk of homelessness." *Id*. (citing D.C. Code § 4-753.01(a)); *see Baltimore v. District of Columbia*, 10 A.3d 1141, 1147 (D.C. 2011) ("By enacting the HSRA, the Council of the District of Columbia sought to implement the concept of 'continuum of care' to address the problem of homelessness in the District of Columbia."). Services for the homeless may include temporary and transitional shelter. *See* D.C. Code § 4-753.01(b).

By the HSRA's plain terms, a person is entitled to shelter only "in severe weather conditions," D.C. Code § 4-754.11(a)(5), meaning "whenever the actual or forecasted temperature, including the wind chill factor or heat index, falls below 32 degrees Fahrenheit or rises above 95 degrees Fahrenheit." *Id*. § 4-751.01(35); *see id*. § 4-753.01(c)(1) ("Whenever the actual or forecasted temperature, including the wind chill factor, falls below 32 degrees Fahrenheit, or whenever the actual or forecasted temperature or heat index rises above 95 degrees Fahrenheit, the District shall make available appropriate space in District of Columbia public or private buildings and facilities for any resident of the District who is homeless and cannot access other housing arrangements."). Otherwise, the HSRA "shall [not] be construed to create an entitlement (either direct or implied) on the part of any individual or family to any services within the Continuum of Care, other than shelter in severe weather conditions as authorized by § 4-754.11[(a)](5)." *Id*. § 4-755.01(a).

Doe is entitled by statute to placement in a shelter only when temperatures exceed the limits set forth in D.C Code § 4-754.11(5).  While certain events described in the complaint occurred during the winter months, *see, e.g.*, Compl. ¶¶ 5, 7, Doe does not allege she was denied shelter *altogether* during the specific extreme weather conditions described in the HSRA.  Therefore, to the extent Doe brings a claim under the HSRA, it is **DISMISSED**.  *See Baltimore*, 10 A.3d at 1154 ("We have established above that except for the right to shelter in severe or frigid weather . . . the District's legislature has not created a statutory entitlement to nor a protected property right or interest in shelter or shelter services.").

## B. Disability Discrimination Claim

The District, as does the Court, presumes that Doe brings a claim under Title II of the Americans with Disabilities Act ("ADA"), which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  The phrase "qualified individual with a disability" means:

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity

42 U.S.C. § 12131(2).  For ADA purposes, the District and its agencies are public entities.  *See* 42 U.S.C. § 12131(1); *Bonnette v. District of Columbia Court of Appeals*, 796 F. Supp. 2d 164, 178 (D.D.C. 2011) (noting that "Title II of the ADA prohibits discrimination in the provision of public services by state and local governments (including the District of Columbia)").  The relevant public services are those the District makes available to homeless persons, and it appears that Doe is eligible for such services.

7

"To state a claim under Title II a plaintiff must allege: (1) that [she] is a qualified individual with a disability; (2) who was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination was by reason of [her] disability." *Lee v. Corr. Corp. of Am./Corr. Treatment Facility*, 61 F. Supp. 3d 139, 142–43 (D.D.C. 2014) (citation and internal quotation marks omitted); *see Equal Rights Ctr. v. District of Columbia*, 741 F. Supp. 2d 273, 283 (D.D.C. 2010). Plaintiff's ADA claim here is insufficient at the outset because, as the District argues, Doe "has not alleged facts to identify a qualified disability," Def.'s Mem. at 10, of which she made the District aware. *See id.* at 11-12.

ADA defines the term "disability" as follows:

> The term "disability" means, with respect to an individual— (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]

42 U.S.C. § 12102(1); *see Widomski v. State Univ. of New York (SUNY) at Orange*, 748 F.3d 471, 474 (2d Cir. 2014) (affirming district court's holding that definition of disability "applies to Title II of the ADA"). Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

The complaint alleges a "directional disabilit[y]," Compl. ¶ 9, a sensitivity to "cleaning chemical bleach," *id.* ¶ 9, and, perhaps, an allergy to animals, given Doe's desire for a shelter without service dogs. *See id.* Later submissions mention "physical and pulmonary medical conditions," Supp. Mem. ¶ 4, to include a visual impairment, a neuromuscular disability, and sleepwalking. *See, e.g., id.* ¶¶ 6-7. Only in broad and vague terms does Doe allege that she is disabled, though. And even accepting her broad allegations as true, they are unsupported by factual

8

allegations demonstrating that any claimed impairment qualifies as a disability as the ADA defines the term.

For example, it is unclear what the term "directional disability" means, or how a "directional disability" combined with a visual impairment becomes a "hybrid disability." Opp'n I at 34. Doe claims to have a visual impairment, the nature or severity of which is not described. Similarly, Doe's allegations regarding a neuromuscular impairment fail to identify a particular condition, or to describe the nature of the impairment or its severity. Missing, too, are factual allegations demonstrating whether and how any impairment substantially limits a major life activity. While "specific allegations about the limitation of a major life activity caused by the plaintiff's impairment are not required to survive a motion to dismiss," *Boykin v. Gray*, 895 F. Supp. 2d 199, 216 (D.D.C. 2012), *aff'd sub nom. Boykin v. Fenty*, 650 F. App'x 42 (D.C. Cir. 2016), even a *pro se* plaintiff must plead a plausible claim. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555–56. Doe's submissions fall short. To be sure, allergies, sensitivity to chemicals, visual impairments, neuromuscular impairments, and sleepwalking could substantially limit a major life activity, such as, breathing, seeing, walking, or sleeping. But Doe merely offers labels without alleging facts describing any particular impairment, how that impairment affects her, or whether and how any so-called impairment substantially limits a major life activity or activities.

Furthermore, even if plaintiff is disabled for purposes of the ADA, there are no allegations plausibly demonstrating that the District denied Doe services otherwise available to the homeless because of Doe's disability or disabilities. The overarching theme, of the original complaint at least, is that the District provides shelter for illegal aliens with children in hotels and does not provide such shelter for Doe, a circumstance unrelated to disability or physical impairment. And Doe does not allege that the District deprived her of shelter altogether. Rather, a fair reading of

Doe's submissions supports a single proposition: that, whether during hypothermia season or not, the District has not provided Doe the shelter of her choice, if not in a hotel with a private bedroom, private bathroom, and doors that lock, then in a shelter in Ward 2 or 3, where bleach is not used for cleaning, which bans service dogs, has adequate lighting, and guarantees her a bottom bunk.

Yet another deficiency of Doe's submissions is the dearth of factual allegations demonstrating that the District knew about her supposed disabilities. "[I]n any action premised on failure to accommodate, the plaintiff typically bears the burden of providing notice of [her] disability and the limitations it imposes." *Faison v. Vance-Cooks*, 896 F. Supp. 2d 37, 57 (D.D.C. 2012) (citing *Crandall v. Paralyzed Veterans of Am.*, 146 F.3d 894, 897–98 (D.C. Cir. 1998)).

Repeatedly, plaintiff asserts that a District government employee told her by telephone that no shelter could accommodate her. But Doe does not identify the employee with whom she spoke or state when the telephone conversation(s) occurred. Nor are there allegations regarding the manner in which she notified the District of her alleged disabilities, when she requested accommodations for those disabilities and the reasons for her request, or when and how she otherwise put the District on notice of her needs. There is no indication that Doe notified the District formally by, for example, submitting a written request of some sort. The District cannot violate the ADA by failing to honor a request for accommodations that it never received. *See Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999). Doe's claim under the ADA is **DISMISSED**.

### C. Equal Protection Claim

Plaintiff invokes the Fourteenth Amendment to the United States Constitution, *see, e.g.*, Compl. ¶¶ 13, 15, and because it does not apply to the District of Columbia, *see Bolling v. Sharpe*, 347 U.S. 497, 499 (1954), the Court will treat Doe's equal protection claim as if she brought it

under the Fifth Amendment. *See, e.g.*, *Alemu v. Dep't of For-Hire Vehicles*, 327 F. Supp. 3d 29, 47 n.13 (D.D.C. 2018) (noting that "[t]he Fourteenth Amendment's equal protection clause applies to the District of Columbia via the Fifth Amendment's due process clause").

The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyer v. Doe*, 457 U.S. 202, 216 (1982)). An equal protection claim can proceed in two forms. A plaintiff "may claim that . . . she received differential treatment by the government due to membership in a protected class, such as one based on race, national origin, or gender." *Kelley v. District of Columbia*, 893 F. Supp. 2d 115, 122 (D.D.C. 2012) (citing *Jones v. Helms*, 452 U.S. 412, 424 n.23 (1981)). "Alternatively, when the alleged differential treatment is not based on membership in a protected class, a plaintiff may claim that . . . she was arbitrarily and intentionally treated differently from others who are similarly situated and that the government lacks any rational basis for treating the similarly situated individuals disparately." *Shuler v. Dicks*, No. 24-cv-1292 (RDM), 2025 WL 894420, at *4 (D.D.C. Mar. 24, 2025) (quoting *Kelley*, 893 F. Supp. 3d at 122), *appeal docketed*, No. 25-7061 (D.C. Cir. Apr. 28, 2025). The District argues that Doe's claim fails either way.

First, in the District's view, "Doe's identification as a U.S. citizen and native Washingtonian without children does not place her in a protected class." Def.'s Mem. at 8. A liberal reading of Doe's submissions suggests an effort, at least, to fit herself into a protected class. It is true that two groups to which Doe belongs that are not protected classes for equal protection purposes: District of Columbia residents, *Banner v. United States*, 428 F.3d 303, 307 (D.C. Cir. 2005) (per curiam), and homeless persons. *Raiser v. City of Los Angeles*, No. 14-cv-0809 RGK RZ, 2015 WL 1321526, at *12 (C.D. Cal. Mar. 19, 2015), *aff'd*, 698 F. App'x 412 (9th Cir. 2017); *Smith v.*

11

*McWhirter*, No. 2:09-cv-0425, 2010 WL 9474636, at *3 (E.D. Va. June 16, 2010) (citing *Joel v. City of Orlando*, 232 F.3d 1353, 1357 (11th Cir. 2000) and *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1269 n.6 (3d Cir. 1992)).

But race is also mentioned in plaintiff's submissions, *see, e.g.*, Opp'n I at 100-01 (alleging "DC Govt employees engaging in race discrimination" (emphasis removed)); Opp'n III at 52-53 (stating "there are very few white girls and very few white girls from Chevy Chase – Ward 3 who are homeless in our Nation's Capital is un-deniably a race-factor"), but not in a meaningful or cogent way, and Doe specifically acknowledges that "blacks who are US citizens are left outside with no open beds" as well. Opp'n III at 108-09; *see id*. at 121-24; Opp'n II at 149-50, 156, 190.

Elsewhere plaintiff brings up the topic of race, *see* Surreply at 3-6; Supp. Mem. ¶¶ 15-16, as an illustration of a characteristic a government may not use to justify treating one group differently than another. *See* Surreply at 3. For example, referring to school desegregation, Doe asserts, "[r]acial discrimination that treated different types of students differently (. . . white students were treated 1 way and . . . black students were treated another way) was not acceptable based on their arbitrary characteristic[] of race." *Id*. (emphasis removed). Similarly, Doe argues, it is impermissible for the District to use "the arbitrary characteristic[] of immigration status [for] treating different homeless single females differently." *Id*. (emphasis removed). Repeatedly Doe returns to theme of "'immigration status' discrimination," *id*. at 5; *see id*. at 6, "treating . . . homeless single females differently (1 = U.S.A. citizen in DC, 1 = not-U.S.A. citizen in DC) where both [are] homeless single females[.]" *Id*. at 3; *see id*. at 4, 7. The complaint offers plenty of labels and conclusions, but too few factual allegations, to state a plausible equal protection claim based on race. The gravamen of plaintiff's complaint seems to be discrimination against people with her

particular mix of characteristics – a homeless, U.S. citizen with no children – who, in her case, is White.

Turning next to national origin, it is not at all clear that Doe alleges unequal treatment on this basis either. The distinction she draws is citizenship. *See, e.g.*, Compl. ¶ 23 (alleging the District "gives un-equal treatment to illegal aliens with children" and "puts the USA citizens (this 2nd generation American and native Washingtonian pro se included) as literally 'outside' homeless while the illegal aliens with children are 'housed' by the defendant"). Her focus squarely is on her status as a United States citizen, and the alleged unequal treatment she receives when compared to "illegal aliens," regardless of the country or countries from whence they come.

Alienage is a protected class, and a classification based on it warrants strict scrutiny. *See United States v. Skrmetti*, 145 S. Ct. 1816, 1828 (2025) (stating that "laws that classify on the basis of race, alienage, or national origin trigger strict scrutiny"); *Graham v. Richardson*, 403 U.S. 365, 371–72 (1971) (remarking that "the Court's decisions have established that classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny"); *Padula v. Webster*, 822 F.2d 97, 102 (D.C. Cir. 1987) (noting Supreme Court's recognition of "only three classifications as suspect: race, . . . alienage, . . . and national origin"). Often, though, the courts are called upon to protect *non*-citizens who invoke the Equal Protection Clause, *see, e.g.*, *Graham*, 403 U.S. at 371-77 (lawfully admitted resident aliens protected by Equal Protection Clause in the context of state welfare laws); *see also Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281, 286-87 (D.D.C. 2011) (citing cases supporting proposition that "foreign citizens in the United States enjoy many of the same constitutional rights that U.S. citizens do"), *aff'd*, 565 U.S. 1104 (2012), recognizing, though, that the rights of non-citizens are not always coextensive with the rights of U.S. citizens. *See, e.g.*, *Matthews v. Diaz*, 426 U.S. 67, 78 (1976)

("[A] host of constitutional and statutory provisions rest on the premise that a legitimate distinction between citizens and aliens may justify attributes and benefits for one class not accorded to the other."); *Bluman*, 800 F. Supp. 2d at 287 (citing cases illustrating the point that "foreign citizens may be denied certain rights and privileges that U.S. citizens possess").

"Typically an equal protection claim is brought by a member of a vulnerable class, who alleges discrimination based upon that membership." *AYDM Assocs., LLC v. Town of Pamelia*, 205 F. Supp. 3d 252, 265 (N.D.N.Y. 2016) (citing *Harlen Assocs. v. Incorporated Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)), *aff'd*, 692 F. App'x 78 (2d Cir. 2017); *see Core by & through Core v. Chicago Bd. of Educ.*, No. 23-cv-05462, 2024 WL 4007722, at *8 (N.D. Ill. Aug. 30, 2024) (citing *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 638 (7th Cir. 2007)). Here, Doe, a United States citizen, casts herself as the disadvantaged one. Missing, however, are factual allegations establishing that a United States citizen shares characteristics common to members of a recognized suspect class. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973) (declining to extend "suspect class" status to a group with "none of the traditional indicia of suspectness: the class is not saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process"); *cf. Toll v. Moreno*, 458 U.S. 1, 20 (1982) (Blackmun, J., concurring) (commenting "both common experience and the unhappy history reflected in our cases . . . demonstrate that aliens often have been the victims of irrational discrimination"). The Court concludes that Doe is not a member of a protected class based on her U.S. citizenship, and to the extent the equal protection claim rests on that basis, it fails.

Second, the District argues that Doe is no more successful in bringing the second type of equal protection claim. *See* Def.'s Mem. at 8-9. This so-called "class-of-one" theory, *see Susman Godfrey LLP v. Exec. Office of the President*, No. 25-cv-1107 (LLA), 2025 WL 1779830, at *21 (D.D.C. June 27, 2025), *appeal docketed*, No. 25-5310 (D.C. Cir. Aug. 26, 2025), "is essentially a claim of unfair treatment." *Neighborhood Assistance Corp. of Am. v. Consumer Fin. Prot. Bureau*, 907 F. Supp. 2d 112, 126–27 (D.D.C. 2012). It "may be maintained 'where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 75 (D.D.C. 2015) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)) (additional citation omitted). Both factors are essential. *See 3883 Connecticut LLC v. District of Columbia*, 336 F.3d 1068, 1075 (D.C. Cir. 2003).

"The first requirement—that there be another party that is similarly situated to the plaintiff—is not a mere formality; rather, it serves to distinguish claims to obtain the treatment that was afforded others, which can be cognizable under principles of equal protection, from bare complaints of governmental unfairness, which cannot." *XP Vehicles*, 118 F. Supp. 3d at 75 (quoting *Quezada v. Marshall*, 915 F. Supp. 2d 129, 135 (D.D.C. 2013)) (internal quotation marks and brackets omitted); *see Barnes v. District of Columbia*, No. 16-cv-1027 (ACR/RMM), 2023 WL 11835280, at *15 (D.D.C. Nov. 3, 2023) (dismissing equal protection claim, noting absence of allegations "that [defendant] acted deliberately to discriminate against [plaintiff] based on his membership in a protected class" and complaint's failure to "identify any other similarly situated individual in comparison to whom [plaintiff] can establish disparate treatment"), *report and recommendation adopted*, No. 16-cv-1027 (ACR), 2023 WL 11835257 (D.D.C. Dec. 4, 2023). Even though "whether an individual is similarly situated to the plaintiff is a question of fact better

decided at summary judgment or by a jury," where the complaint "does not identify anyone who was similarly situated to [plaintiff] but treated differently," the Court need only conclude that plaintiff "has . . . failed to state an equal protection claim." *Grivnow v. Bowser*, No. 20-cv-2000 (CRC), 2022 WL 4130838, at *7 (D.D.C. Sept. 12, 2022) (internal citations omitted).

To the extent one reads the complaint generously to identify similarly situated individuals, plaintiff compares herself to other homeless women. But she complains that she does not receive the same accommodations as non-citizen homeless women with children. If a plaintiff is not a member of a protected or suspect class, the government's classification does not run afoul of the Equal Protection Clause as long as it is rationally related to a legitimate government interest. *See City of New Orleans v. Dukes,* 427 U.S. 297, 303 (1976) ("Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest."); *see also 2910 Georgia Ave. LLC v. District of Columbia*, 234 F. Supp. 3d 281, 311 (D.D.C. 2017). This so-called rational basis review "is highly deferential to the government." *Lillemoe v. U.S. Dep't of Agric., Foreign Agric. Serv.*, 344 F. Supp. 3d 215, 229 (D.D.C. 2018) (quoting *XP Vehicles*, 118 F. Supp. 3d at 76) (internal quotation marks and brackets omitted).

"[A]n equal protection claim fails under Rule 12(b)(6) if the complaint itself suggests a rational basis for the government action." *XP Vehicles*, 118 F. Supp. 3d at 76 (citing *Miller v. City of Monona*, 784 F.3d 1113, 1121 (7th Cir. 2015) ("[I]t is possible for plaintiffs to plead themselves out of court if their complaint reveals a potential rational basis for the actions of local officials.")) (additional citations omitted). Thus, "[e]ven at the motion to dismiss stage, a plaintiff alleging an equal protection violation must plead facts that establish that there is not any reasonable

16

conceivable state of facts that could provide a rational basis for the classification." *Hettinga v. United States*, 677 F.3d 471, 479 (D.C. Cir. 2012) (per curiam) (citation and internal quotation marks omitted); *see also Jackson v. Village of Western Springs*, No. 14–3641, 612 F. App'x 842, 847, 2015 WL 2262703, at *4 (7th Cir. May 15, 2015).

Also, "class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves," *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59–60 (2d Cir. 2010) (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)), and Doe falls short, alleging no facts to demonstrate that a single homeless woman is similarly situated to a single homeless woman with children or, essentially, a family. *See Tate v. District of Columbia*, 627 F.3d 904, 910 (D.C. Cir. 2010) (dismissing equal protection claim of plaintiff who "has not identified any similarly situated person . . . who was treated differently"). And surely there is a rational basis for treating homeless women with children differently than single homeless women when assigning sleeping arrangements, given the inherent vulnerability of children, and their need for proximity to a parent. Doe's equal protection claim is **DISMISSED**.

### D. The District's So-Called Status as a "Sanctuary City"

The complaint mentions the District's "'Sanctuary City' policies," Compl. ¶ 22, and alleges that such "policies violated federal immigration law as the [District] gives un-equal treatment to illegal aliens with children." *Id* ¶ 23. Doe draws a distinction between the District's alleged treatment of "illegal aliens" and United States citizens, without identifying any particular policy. Nor does the reference to "the recent Supreme Court . . . decision that USA citizens who include non-parents on USA soil do not have a right to be 'outside' homeless while the single non-parent USA citizen has not a secured, private lodging to go to in DC," *id*. ¶ 26, clarify matters.

Presumably Doe directs the Court's attention to *City of Grants Pass, Ore. v. Johnson*, 603

U.S. 520 (2024).  It does not appear that *Grants Pass* is relevant here, as the Supreme Court addressed "only [the] question [of] whether one specific provision of the Constitution—the Cruel and Unusual Punishments Clause of the Eighth Amendment—prohibits the enforcement of public-camping laws."  *Id*. at 557; *see Bounce v. City of Miami Beach*, No. 1:25-cv-20937, 2025 WL 720928, at *2 (S.D. Fla. Mar. 6, 2025) (commenting that *Grants Pass* "expressly rejected the proposition that criminalizing sleeping outside, even when no alternative shelter exists, constitutes cruel and unusual punishment under the Eighth Amendment"), *appeal transferred sub nom. Bounce v. Miami Beach, FL*, No. 25-1625, 2025 WL 1720533 (Fed. Cir. June 20, 2025).

## IV.  CONCLUSION

The Court concludes that Doe's complaint, taken together with her subsequent submissions, fails to state a claim upon which relief can be granted.  The District's motion to dismiss, therefore, is **GRANTED**.  An Order is issued separately.

DATE: September 30, 2025

/s/
AMY BERMAN JACKSON
United States District Judge